This is an appeal from a judgment of the Hudson County Court of Common Pleas reversing an award in petitioner's favor by the Workmen's Compensation Bureau.
In 1942, the decedent, Louis J. Salerno, then 24 years of age, was rejected by the military authorities and thereafter was examined by a doctor who told him that his blood pressure was "very high" and that he was to take it easy and not do any hard work. He was admitted to the Jersey City *Page 72 
Medical Center on February 3, 1942, and was discharged on February 20, 1942, with the final diagnosis stated to be "Hypertension. Renal vascular disease. Coronary disease with myocardial damage." During the same year he was examined by Dr. Matturri who diagnosed his condition as malignant hypertension and who testified that he was "very sick in the sense that he had this blood pressure which could have been very dangerous to him." Thereafter he was examined by Dr. Matturri every two or three months over a period of two years. He often complained about "terrific headaches" and his face was frequently flushed.
On August 20, 1945, the decedent was employed by the respondent as a turner and laborer. On September 24, 1945, he had bent over while engaged in his work and in bringing himself to an erect position, he struck the top of his head against a blunt edge of a hoist. His supervisor, Mr. Griscavage, testified that the decedent appeared pale and stunned and that there was blood at the point of injury. The supervisor then went with him to the first aid attendant, Mr. Lehner, who testified that the decedent "had a little cut on his head" but that he thought a doctor should look at it because "of the hair of the scalp" and the danger of infection. Mr. Lehner then drove the decedent to Dr. Chapman's office where the wound was cleaned and dressed. Dr. Chapman testified that the injury was "only a superficial scalp wound;" that he asked the decedent "if he was dizzy or anything like that, but there was no evidence of such a thing;" that the wound healed in the ordinary length of time; that he discharged the decedent on October 2nd, and that at no time did the decedent complain or give indication of headaches, dizziness, vomiting or other indicia not incidental to the ordinary superficial scalp wound. Mr. Lehner testified that the decedent made no complaints to him and that he returned to work from Dr. Chapman's office on the day of the accident. Mr. Griscavage testified that following the accident the decedent worked regularly every day as a turner, which required that he stand before a lathe and that he worked in normal fashion and made no complaints whatever. *Page 73 
On the evening of October 4, 1945, the decedent had returned from a movie, was upstairs preparing for bed, evidently fell to the floor unconscious, and was immediately found by his mother who had heard the noise. He was taken to the hospital and died within several hours without regaining consciousness. The hospital records set forth the final diagnosis as "Malignant hypertension with cerebrovascular hemmorrhage" and the death certificate states that the immediate cause of death was "Cerebral Hemorrhage."
Several members of the decedent's family testified as to his conduct between the date of the accident and the date of death. Their pertinent testimony was meager and considering their interest and their acknowledgment that decedent made no complaints after the accident, apart from headaches, which he had before the accident, we have concluded that the credible testimony in the record supports the view that except for the scalp wound and the usual incidents thereof, there were no observable symptoms of significance after the accident. The county judge expressly stated that "there were no bridging symptoms between the accident and the death;" and our finding is that in the light of all the testimony in the record, petitioner failed to establish that significant bridging symptoms did exist.
On behalf of the petitioner, Doctors Grossman and Meehan, in response to a hypothetical question, expressed the opinion that there was causal relation between the accident and the decedent's death. Dr. Grossman testified that "malignant hypertension is more apt to be a rapid progressive type of hypertension, usually affecting younger people" and very often results in cerebral hemorrhage. He further testified that where there is an interval of ten days between an accident and a cerebral hemorrhage causing death, it is "possible but not probable" that the accident would cause the death without any bridging symptoms. Dr. Meehan evidently considered that there were bridging symptoms between the accident and death and referred to the decedent's headaches, but acknowledged that nothing in the hypothetical question indicated that those headaches were different from those occurring prior to the accident. *Page 74 
On respondent's behalf Doctors Olcott and Yaguda testified, in response to a hypothetical question, that there was no causal relation between the accident and the cerebral hemorrhage resulting in death. Dr. Olcott testified that where a blow to a person suffering from hypertension was sufficient to cause hemorrhage, the results were "unmistakably immediate" and that he heard nothing in the hypothetical question of any bridging symptoms which might tie the injury to the ultimate hemorrhage. He expressed the view that the decedent "died a natural characteristic death as the end result of the malignant hypertension." From his examination of the hospital records, he stated that he found "proof positive of the fact that the degenerative effect of the disease on the kidneys had at that time advanced to a considerable point" and that "the man on the day of his death was at the very last stage of the disease itself without regard to any extraneous influence of any kind whatsoever." Dr. Yaguda testified that the entire picture was "one of progressive hypertensive disease, and the termination is typical of the termination in these cases" and that he could find no evidence of any essential bridging symptoms which might indicate causal relation between the accident and the cerebral hemorrhage resulting in death.
The county judge stated that he was more impressed with the respondent's experts and accepted their view that the absence of significant bridging symptoms negatived causal relation and indicated that the decedent's death resulted "solely from his long existing disease." We have reached the same conclusion. The issue was entirely factual and the burden was on the petitioner to establish the probability that the accident contributed to the fatal cerebral hemorrhage. The possibility that it did may be assumed, but admittedly that is not sufficient. In the light of the highly progressive and dangerous nature of the decedent's illness and the absence of the significant bridging symptoms, recognized by the persuasive medical testimony as necessary to a finding of probable causal relation, we are satisfied that the petitioner has not sufficiently carried her burden of proof. In the light of *Page 75 
this determination, we find no occasion to consider the additional issue raised by the respondent that the Bureau had also erred in its finding that the decedent's mother and half sister were totally dependent upon him.
The judgment below is affirmed.